PNC BANK, NATIONAL ASSOCIATION, formerly Pittsburgh National Bank, Plaintiff,

v.

LIBERTY MUTUAL INSURANCE COMPANY, Defendant.

Civil Action No. 94–1692.

United States District Court, W.D. Pennsylvania.

Jan. 10, 1996.

Richard B. Tucker, III, Tucker, Arensberg, Pittsburgh, PA, for Plaintiff.

Brian A. Davis, Lisa Fishbone Wallack, Choate, Hall & Stewart, Boston, MA, Charles C. Casalnova, O'Keefee, Grenen & Birsic, Pittsburgh, PA, for Defendant.

## OPINION

CINDRICH, District Judge.

### I. Introduction

This is an action for breach of warranty and fraudulent misrepresentation arising out of the bank issuer's payment of $3 million to the beneficiary upon presentment of a sight draft drawn against an irrevocable, standby letter of credit. The issuer, PNC BANK, ("PNC") (formerly Pittsburgh National Bank), has its principal place of business in Pittsburgh, Pennsylvania, and the beneficiary, Liberty Mutual Insurance Company ("Liberty Mutual"), has its principal place of business in Boston, Massachusetts. Jurisdiction is predicated upon diversity of citizenship and an amount in controversy which exceeds $50,000. 28 U.S.C. § 1332.

Pending before the court are the parties' cross-motions for summary judgment accompanied by supporting evidentiary material. The parties agree that there are no material questions of fact and that disposition of this case is properly based upon the court's interpretation of the applicable law and the documents relevant to the transaction. This being a diversity jurisdiction case, the law of the Commonwealth of Pennsylvania will be applied.

Among the documents submitted by Liberty Mutual are the affidavit and revised affidavit of Arthur G. Lloyd ("Lloyd Affidavits"). PNC's motions to strike the Lloyd Affidavits will be decided together with the cross-motions for summary judgment.

PNC claims that it is entitled to summary judgment because Liberty Mutual breached its warranty under Uniform Commercial Code ("U.C.C.") § 5–111(1) by presenting a signed statement accompanying its draw on a letter of credit containing a fact or facts which it knew to be untrue. Based on this same document, PNC also requests summary judgment on its claim of fraudulent misrepresentation.

Liberty Mutual concedes that the document it signed and presented to PNC in connection with its draw contained a statement which was not literally true. However, it argues that UCC § 5–111 does not impose a warranty of literal truthfulness upon the presenter, but only a warranty that the conditions of the credit have been met.

Thus, the resolution of this case turns upon the interpretation of the UCC § 5–111(1) beneficiary warranty under the law of Pennsylvania. The issue boils down to this: does the beneficiary who presents a demand for payment on a letter of credit implicitly make a representation that any factual statements contained in the documents of presentment are literally true or is the warranty limited to a representation that the conditions of the credit have been met?

On September 22, 1995, we heard oral argument on all motions. For the reasons which follow, Liberty Mutual's summary judgment motion will be granted, PNC's summary judgment motion will be denied, and PNC's motions to strike will be granted in part and denied in part.

### II. Facts

Mellon–Stuart Holding Company ("Mellon–Stuart"), formerly a Pennsylvania construction company, was a banking customer of PNC. From 1983 through 1988, Liberty Mutual issued annual workers' compensation and comprehensive general liability insurance policies to Mellon–Stuart on a "cash flow retrospective" basis. Also known as "cash flow rating plans," these policies provided for annual adjustments in Mellon–Stuart's estimated premiums based upon the company's actual claims history. Thus, depending on the claims history, examined retrospectively, the insured could owe the insurer more than the premium initially paid. This unpaid portion is referred to as the "deferred annual premium". Pursuant to the terms of these insurance policies, Mellon–Stuart and Liberty Mutual entered into six separate premium payment agreements, each of which required Mellon–Stuart to obtain an irrevocable letter of credit in favor of Liberty Mutual in order to guarantee the payment of its deferred annual premiums. From 1983 until 1988, Mellon–Stuart obtained six irrevocable letters of credit for the benefit of Liberty Mutual, five of which were issued by PNC and one by another bank.

Administration of the six letters of credit, which required sight drafts in fluctuating amounts, grew increasingly difficult. Accordingly, in 1989, the five letters of credit issued by PNC, in the aggregate amount of $2.8 million, were consolidated into a single, $3 million irrevocable letter of credit. Like the predecessor letters, this one was unsecured.

It is undisputed that Mellon–Stuart and Liberty Mutual intended that the new letter of credit serve as a "blanket" to guarantee premium payments for all open policy years from 1983 through 1989 and that PNC was aware of this intention. At its customer's request, PNC personnel drafted the revised letter of credit to accomplish that purpose.

However, despite this shared intention, the language of the new, consolidated letter of credit required the beneficiary to present a sight draft accompanied by a signed statement that the draw represented funds due as a result of the non-payment of premiums due under the *1984 premium agreement* and made no reference to any other premium years. Specifically, the PNC letter of credit contains the following presentment language which forms the basis of this litigation:

THE AMOUNT OF OUR DRAWING REPRESENTS FUNDS DUE AS A RESULT OF THE FACT THAT MELLON–STUART HOLDING COMPANY HAS NOT PAID PREMIUMS DUE TO US UNDER AGREEMENT DATED AUGUST 1, 1984.

The "Agreement dated August 1, 1984" provides for premium payments for that year only and makes no reference to prior or subsequent years. PNC concedes that it made a "mistake" in drafting. Liberty Mutual was aware of the language as drafted by PNC; however, neither party did anything to rectify it.

In May 1992, Mellon–Stuart filed for bankruptcy protection. On October 9, 1992, Liberty Mutual drew upon the letter of credit for the maximum amount by presenting PNC with a $3 million sight draft accompanied by a signed statement in language that matched the presentment statement of the amended PNC letter of credit. Payment was made without further inquiry of Liberty Mutual or the account party. No more than $150,960 was due under the 1984 premium agreement, but Liberty Mutual was owed in excess of $3 million for policy years through 1989.

In this suit for breach of warranty and fraudulent misrepresentation, PNC claims it was damaged in the amount of $2,849,040, representing the difference between the amount paid to Liberty Mutual upon its presentment of the sight draft and the amount Mellon–Stuart actually owed Liberty Mutual for the unpaid deferred insurance premiums under the 1984 premium agreement.[1]

### III. Discussion

PNC argues that the "independence principle" in the law of letters of credit requires that the beneficiary bear the responsibility of discovering deficiencies in a letter of credit. According to PNC, the independence principle dictates that the beneficiary bear any financial loss incurred where a letter of credit has failed in achieving its intended commercial purpose. PNC maintains that the $3 million letter of credit issued in 1989 failed to secure Mellon–Stuart's premium obligations to Liberty Mutual for all policy years beginning 1983 through 1989 because of the language in the statement of presentment referring only to the 1984 premium year and having failed to meet those desired commercial ends cannot be reformed to reflect the intended scope of coverage.

PNC's argues that under Section 5–111(1) of the Uniform Commercial Code a beneficiary of a letter of credit warrants the truthfulness of signed statements made in documents it is required to present in order to draw funds. According to PNC, Liberty Mutual breached the U.C.C. § 5–111(1) warranty by presenting the $3 million sight draft and the accompanying statement while knowing that Mellon–Stuart owed less than $3 million under the 1984 premium agreement. PNC contends that under the rule of strict compliance, Liberty Mutual is not entitled to retain

---

1. PNB also claims interest from October 1992 until the date of judgement as well as punitive damages on the fraudulent misrepresentation claim.

those funds since it failed to adhere to the requirements of the letter of credit.

Liberty Mutual argues that the warranty of U.C.C. § 5–111(1) does not constitute a representation as to the literal accuracy of the factual assertions contained in the drawing documents presented to the issuer. Rather the beneficiary warrants that there is no material fraud in the underlying transaction or forgery of the documents. Liberty Mutual contends that it is undisputed that the $3 million letter of credit was intended to secure Mellon–Stuart's premium obligations to Liberty Mutual for all policy years from 1983 through 1988 and, therefore, the letter of credit must be construed in a manner consistent with this clear intention.

Liberty Mutual further argues that PNC has not suffered any compensable loss as a result of its decision to draw upon the letter of credit in 1992 since, regardless of the truthfulness of the assertions in the presentment clause, Mellon–Stuart did default upon its obligations in an amount in excess of $3 million and Liberty Mutual was entitled to draw up to the full amount of the face value of the letter of credit. Thus, PNC's measure of damages, if any, is the difference between the position it expected to be in *if* Mellon–Stuart defaulted and the position it now occupies since Mellon–Stuart *has* defaulted.

## IV. Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

As previously stated and as the parties agree, the disposition of this case turns upon interpretation U.C.C. § 5–111(1) and not upon any fact finding. Accordingly, we will proceed directly to an analysis of this law.

## V. The Law of Letters of Credit

### A. Warranties of Beneficiary

The Pennsylvania law pertinent to this suit, U.C.C. § 5–111(1), codified at 13 Pa.

C.S.A. § 5111(a), provides in pertinent part as follows:

(a) **Warranties of beneficiary.**—Unless otherwise agreed the beneficiary by transferring or presenting a documentary draft or demand for payment warrants to all interested parties that the necessary conditions of the credit have been complied with.

The warranty of the beneficiary is that of compliance with the "necessary conditions of the credit." Although the U.C.C. does not define the phrase "necessary conditions of the credit", this section expresses the beneficiary's warranties with respect to the draft or the relevant documents. U.C.C. § 5–111, Official Comment.

Unfortunately, there is no clear cut Pennsylvania or Third Circuit case law governing the precise issue before this court. Moreover, the courts that have addressed the meaning of § 5–111(1) differ in their interpretation of the precise nature of the warranty extending from the beneficiary to the issuing bank.

There is some authority for PNC's view that a beneficiary warrants the truthfulness of assertions in the documents and that a breach occurs when the documents presented contain false recitations of fact necessary to make the documents conform to "the conditions of the credit". *See, e.g., Mellon Bank, N.A. v. General Elec. Credit Corp.,* 724 F.Supp. 360, 363 (W.D.Pa.1989); *Pubali Bank v. City Nat'l Bank,* 676 F.2d 1326, 1329 (9th Cir.1982), *appeal after remand,* 769 F.2d 605 (9th Cir.1985). These cases turn upon the notion that when the "false" statements were presented, "conditions for the draw" had not been satisfied. *See Pubali,* 676 F.2d at 1329.

However, this court is persuaded by the alternate school of thought. U.C.C. § 5–111(1) refers to the beneficiary's compliance with the "conditions of the credit," not the "conditions for the draw". This language denotes a beneficiary's compliance with conditions of the letter of credit as specified in that document rather than compliance with any conditions of the underlying contract. *Mitsui Mfr. Bank v. Texas Commerce Bank,* 39 U.C.C.Rep.Ser. 603, 606, 159 Cal.App.3d

1051, 206 Cal.Rptr. 218 (1984); 2 White & Summers, *Uniform Commercial Code* § 19–12 (3d ed. Supp.1994).

■ The usual conditions of a letter of credit are that the documents required to be presented have been presented and that the statements required to be made have been made to the issuer. *Amwest Surety Ins. Co. v. Republic Nat'l Bank,* 977 F.2d 122, 129 (4th Cir.1992). Rarely does a letter of credit specify that the veracity of the required statement is a condition of the credit. Veracity was not made an express condition of the PNC letter of credit. The presentment required only that the presenter sign the required statement.

■ If the truth of the assertion contained in the statement is one of the "necessary conditions" of the letter of credit then the warranty of U.C.C. § 5–111(1) would be breached upon a beneficiary's presentment of a false or inaccurate statement. *Id.* In our view, in the absence of language expressly making veracity a condition of the credit, so long as the beneficiary presents to the issuer documents which conform with the conditions of the letter of credit, the warranty of presentment under U.C.C. § 5–111(1) is not breached. *Farmers–Merchants Bank & Trust Co. v. Travelers Indemnity Co.,* 791 F.Supp. 150, 153 (W.D.La.1992).

■ Our interpretation is supported by synonymous use of the terms "credit" and "letter of credit" in U.C.C. § 5–103(1), which defines both terminology in the following manner:

"Credit" or "letter of credit." An engagement by a bank or other person made at the request of a customer and of a kind ... that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit. A credit may be either revocable or irrevocable. The engagement may be either an agreement to honor or a statement that the bank or other person is authorized to honor.

The two terms are used interchangeably. Therefore, a beneficiary's warranty of compliance with "conditions of the credit" literally reads as compliance with "conditions of the letter of credit." *Amwest,* 977 F.2d at 128. Such warranties have no logical connection with the terms of any contractual relationship between the beneficiary and the bank customer.

■ PNC argues that the independence principle of letter of credit law supports a conclusion contrary to that which we reach. Ironically, the position advanced by PNC abrogates the principle. The independence principle means that the letter of credit is a commercial instrument separate from the transaction between the customer, in this case Mellon–Stuart, and the issuing bank. Secondly, and more important to our analysis, the principle means that the letter of credit is separate from the underlying contract between the customer and the beneficiary. *Wood v. R.R. Donnelley & Sons Co.,* 888 F.2d 313, 317 (3d Cir.1989); *Chase Manhattan Bank v. Equibank,* 550 F.2d 882, 885 (3d Cir.1977). Pennsylvania considers this independence necessary to preserve the basic policy of letter of credit law. *Wood,* 888 F.2d at 318. Under the independence principle, the issuer is obligated to honor a draft "when the beneficiary presents conforming documents without reference to compliance with the terms of the underlying contract between the customer and the beneficiary." *Tudor Dev. Group, Inc. v. United States Fidelity & Guar. Co.,* 968 F.2d 357, 360 (3d Cir.1992). Thus, absent knowledge that the presenting documents are the product of fraud, the issuer's obligation to pay the beneficiary is "independent of the conduct of the underlying transaction." *Banco Nacional de Desarrollo v. Mellon Bank, N.A.,* 726 F.2d 87, 91 (3d Cir.1984). This is why the independence principle is deemed the most salient feature of a letter of credit. *Tudor,* 968 F.2d at 357; *Wood,* 888 F.2d at 317.

■ Applying these principles to this case, it is instructive to note that PNC admits that at the time it drafted the documents, it was unaware of the terms of the 1984 premium agreement between Mellon–Stuart and Liberty Mutual. Thus, for all it knew, the "agreement dated August 1, 1984" referenced in its letter of credit could have had clauses covering premium year 1983 and all subsequent years. Indeed, since it knew

that this was the intent of the parties in 1989 when it drafted the revised letter of credit combining all five of its prior letters, we may fairly assume that PNC did labor under this misconception. The undisputed evidence demonstrates that until sometime after its payment PNC always believed that upon presentation of the sight documents, it would have to pay out up to the full $3 million, representing defaults in multiple years. (See Carpenter memorandum, Defendant's Appendix, Exhibit 9, wherein this precise understanding is expressed in internal memoranda).

PNC's handling of the letter of credit arrangements provides a good illustration of the application of the independence principle to a live commercial transaction. Simply put, PNC was ignorant of the terms of the 1984 agreement for a good reason: it was never PNC's business to inquire into the details of the contractual arrangement between its customer and the beneficiary, but only to make a determination as to whether it was willing to pay $3 million to a beneficiary under a letter of credit, and if so, for what fee, and under what conditions. It specified those conditions—that the beneficiary present a signed statement referencing the 1984 agreement—the conditions were met and payment was made forthwith.

The letter of credit has for many years been a valuable tool for use in the world of commercial transactions. It has enabled parties to enter into contracts and arrangements they would not otherwise hazard, thereby facilitating trade and commerce. It has retained its utility because of the beneficiary's knowledge that regardless of any credit risk associated with the party with whom it proposed to contract, upon presentment of papers in the form specified, payment would be made—without question, without reservation and forthwith. Because banks usually collateralize such letters, any subsequent issues for litigation have been largely limited to those between the bank's customer and the party with which it contracted. The interpretation urged upon us by PNC would serve to reduce the degree of payment certainty among letter of credit beneficiaries and thereby undermine the usefulness of this venerable and time-honored commercial tool.

There is no unfairness to PNC in this result. It bargained for a fee of $30,000 per year in exchange for its agreement to pay up to $3 million to a named beneficiary, it received that fee, and it paid the funds under the conditions that it specified. Clearly, in 1989, when PNC consolidated into a single $3 million instrument the five prior letters of credit covering separate policy years, but equalling $2.8 million in the aggregate, it knew that its exposure upon a Mellon–Stuart default was $3 million. Any errors in banking judgment attendant to its failure to collateralize the letter of credit should not result in harm to the beneficiary.

Accordingly, the motion of Liberty Mutual for summary judgment on PNC's action for breach of the warranty of U.C.C. § 5–111(1), 13 Pa.C.S.A. § 5111(a), will be granted and the motion of PNC for summary judgment on that point will be denied.

### B. Fraudulent Misrepresentation

■ Of necessity, our ruling on the letter of credit disposes of PNC's claim that Liberty Mutual fraudulently misrepresented the amount owed by Mellon–Stuart under the 1984 premium agreement. In Pennsylvania, the elements of a claim for common law fraudulent misrepresentation are: (1) a misrepresentation of fact; (2) communication of that misrepresentation; (3) intent by the defendant that the plaintiff will be induced to act in reliance upon the misrepresentation; (4) justifiable reliance by the plaintiff upon the misrepresentation; and (5) damages proximately caused by that reliance. *Berda v. CBS, Inc.*, 800 F.Supp. 1272, 1276 (W.D.Pa.1992), *aff'd*, 975 F.2d 1548 (3rd Cir. 1992) (citations omitted).

■ We find as a matter of law that the presentment clause in the PNC letter of credit does not constitute a representation as to facts and thus, it cannot form the basis of a claim for fraudulent misrepresentation against under Pennsylvania law. Our reading of U.C.C. § 5–111(1) compels the conclusion that a beneficiary warrants only that the presenting documents and signatures are

genuine and comply with the terms of the letter of credit, and not that the statement which a beneficiary makes in order to comply with the credit is itself a truthful assertion. *Amwest,* 977 F.2d at 128. *See also Phillips College, Inc. v. Riley,* 844 F.Supp. 808, 815 (D.D.C.1994).

■ Alternatively, if the court errs in its interpretation of § 5–111(1) and the statement in the presentment was one of fact, then the misrepresentation claim must still fail because the undisputed evidence is that PNC did not act in reliance on that "misrepresentation". As indicated previously, PNC at all times believed that upon presentation of the draft, it would have to pay out the full $3 million. It may have had this belief because it misconstrued the 1984 document or simply because it knew what the parties intended. Whatever the reasons for its understanding of its obligation, PNC cannot now claim that it paid this amount because it relied upon any misrepresentation made by the beneficiary in the documents of presentment.

Secondly, again assuming that the statement made in the presentment was one of fact, the fifth prong of the tort of fraudulent misrepresentation is nonetheless not met— that is, PNC has suffered no damages as a result of the misrepresentation. This is because, as previously set forth, PNC was at all times aware that the letter of credit was intended to secure moneys owed to the beneficiary for premium years from 1983 through 1989. It issued the letter of credit knowing that if payments were not made by its customer, the beneficiary had the right to demand payment of the entire $3 million. It concedes that the beneficiary's actual loss exceeded $3 million. Thus, any loss it suffered was not proximately caused by any misrepresentation in the presentment documents on the part of the beneficiary.

The motion of Liberty Mutual for summary judgment on PNC's action for fraudulent misrepresentation will be granted and the motion of PNC for summary judgment on this issue will be denied.

## VI. The Lloyd Affidavits

PNC moves to strike the Lloyd Affidavit on the basis that they fail to comport with the proper form of affidavits required to support a motion for summary judgment under the Rule 56(e) of the Federal Rules of Civil Procedure.[2] Specifically, PNC argues that the Lloyd Affidavits offer conclusions on the ultimate issue of law presented in the case, refer to irrelevant customs or practices in the banking industry, and contain argumentative statements and otherwise inadmissible material to which the affiant is not competent to testify, or of which the affiant has no personal knowledge.

Liberty Mutual contends that the Lloyd Affidavits are permitted under FED.R.CIV.P. 56(e) as "expert affidavits" which, like expert testimony are admissible under Rule 703 of the Federal Rules of Evidence, even though comprised of opinion and conclusions, rather than facts within the affiant's personal knowledge. Liberty Mutual further contends that evidence of industry customs and practices, as well as the law of letters of credit, is highly relevant to our legal interpretation of U.C.C. § 5–111(1) and to our determination of the respective obligations of the parties.

The affiant, an attorney admitted to the bar in two states, avers that his qualifications include prior service as general counsel and vice president of a large commercial bank, active participation in banking law professional associations, and participation in an ABA banking task force. Affidavit of Arthur G. Lloyd, ¶ 1 and 2. He readily states that the expert opinion he renders embraces the ultimate legal question that the court must decided. *Id.* ¶ 4. The body of the affidavit analyzes the law of letters of credit, summarizes the testimony of deposition witnesses, and opines on the defenses to suit that Liberty Mutual may raise. *Id.* ¶ 6–30. The re-

---

**2.** Rule 56(e) of the Federal Rules of Civil Procedure provide, in part, as follows:

**(e) Form of Affidavits; Further Testimony; Defense Required.** Supporting and opposing affidavits shall be made on personal knowl-

edge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. . . .

FED.R.CIV.P. 56(e).

vised affidavit is an abbreviated version of the original document and contains the same legal arguments and conclusions. (Document # 34).

The use of opinion evidence in the form of an affidavit is appropriate to support or oppose a motion for summary judgment. Opinion testimony that would be admissible at trial may be considered. *Paton v. La Prade*, 524 F.2d 862, 871 (3d Cir. 1975). A court must disregard an expert affidavit where the affidavit is "essentially conclusory" and lacks specific facts. *Shaw by Strain v. Stackhouse*, 920 F.2d 1135, 1144 (3d Cir.1990) (quoting *Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir.1985)).

The Lloyd affidavits present a mixed bag of information. Some of it is in the nature of expert opinion or testimony as to industry custom and practice while other portions amount to no more than additional legal argument as to the correct interpretation of the applicable law and attempts to construe testimony in the light most favorable to Liberty Mutual.

These arguments on the law would not be admitted at trial and were inappropriate material for our consideration in support of the motion of Liberty Mutual for summary judgment. We hasten to add, however, that they were not much different than information which might be found in legal briefs and for that reason, had no real impact on the decision of the court. The court disregarded those portions of the Lloyd Affidavits which amount to supplemental arguments on the law and summarization of deposition testimony and considered only the balance of the affidavits dealing with industry practice and custom. Accordingly, the motion of PNC to strike the Lloyd Affidavits will be granted in part and denied in part.

An appropriate order follows.

### ORDER

AND NOW, this 10th day of Jan., 1996, upon consideration of the motions for summary judgment of plaintiff PNC Bank, National Association (Document No. 22) and defendant Liberty Mutual Insurance Company (Document No. 16), as well as the oral argument and briefs in support and opposition thereto, IT IS HEREBY ORDERED that the motion of PNC Bank, National Association is DENIED and the motion of Liberty Mutual Insurance Company is GRANTED.

IT IS FURTHER ORDERED that the motions of PNC Bank, National Association to strike the affidavits of Arthur G. Lloyd (Document Nos. 25 and 35) are GRANTED insofar as the affidavits contain case citations and arguments on the law and DENIED, insofar as the affidavits contain information pertaining to industry custom and practice.

The Clerk of Courts is DIRECTED to mark the docket in this case closed.